UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| RACHEL GREGG d/b/a PREFERRED CLEANERS, ) ) ) | |
| Plaintiff, ) ) | No. 1:06-cv-203 |
| v. ) ) | Lee |
| Y. A. CO. CO., LTD, d/b/a FUJISTAR SHIRT ) SYSTEM, and ROBERT E. NABORS, ) ) | |
| Defendants. ) | |

## MEMORANDUM and ORDER

### I.     Introduction

Before the Court are: (1) the motion of defendant Robert E. Nabors ("Nabors") for summary judgment pursuant to Fed. R. Civ. P. 56 [Doc. No. 39]; (2) the second motion of defendant 19172 Corporation d/b/a/ Fujistar Shirt System ("Fujistar") for summary judgment pursuant to Fed. R. Civ. P. 56 [Doc. No. 41]; (3) the motion of plaintiff Rachel Gregg d/b/a Preferred Cleaners ("Plaintiff") for summary judgment on Nabors' counterclaim under Fed. R. Civ. P. 56 [Doc. No. 56]; and (4) Nabors' motion to substitute exhibit [Doc. No. 61].  Several pleadings have been filed in support of and in opposition to the pending motions for summary judgment [Doc. Nos. 40, 42, 47, 48, 49, 50, 57 & 60], all of which have been carefully reviewed and fully considered.

For the reasons set forth below: (1)  Fujistar's second motion for summary judgment [Doc. No. 41] will be **GRANTED** and Plaintiff's remaining claims against Fujistar will be **DISMISSED WITH PREJUDICE**; (2) Plaintiff's motion for summary judgment on Nabors' counterclaim [Doc. No. 56] will be **DENIED** and those claims will proceed to trial; (3) Nabors' motion to substitute exhibit [Doc. No. 61] will be **GRANTED**; and (4) Nabors' motion for a summary judgment [Doc.

No. 39] will be **DENIED** and those claims will proceed to trial.

## II.    Background

### A.    Procedural

Plaintiff filed her original complaint in the Chancery Court of Hamilton County, Tennessee, on August 17, 2006 [Doc. No. 1-2]. Named as defendants in Plaintiff's original complaint were Y.A. Co.Co. Ltd. d/b/a Fujistar Shirt System and Nabors [Doc. No. 1-2 at ¶ 1]. Plaintiff asserted "Nabors is an employee and/or agent of the defendant, Y.A. Co.Co. Ltd., d/b/a Fujistar Shirt System." [*Id.*]. Plaintiff alleged defendants sold Plaintiff a shirt pressing machine (the "shirt machine") and that the defendants provided warranties and guaranties on the shirt machine [Doc. No. 1-2 at 1]. Plaintiff asserted the shirt machine never worked properly or complied with the guarantees and warranties provided by law under the Tennessee Uniform Commercial Code, Tenn. Code Ann. §§ 47-2-313, *et seq.* (the "TUCC") [*id.* at 1-2]. Plaintiff requested an award of compensatory, punitive, and consequential damages, including loss of business profits, interest paid on the loan to purchase the shirt machine, and attorney's fees [*id.* at 2].

On September 22, 2006, Plaintiff's action was removed from state court to this Court pursuant to 28 U.S.C. § 1441 [Doc. No. 1]. On November 22, 2006, Fujistar filed its first motion for summary judgment [Doc. No. 14]. On March 15, 2007, Plaintiff filed a motion to amend her complaint under Fed. R. Civ. P. 15 to correct the name of Fujistar to 19172 Corporation d/b/a Fujistar Shirt System [Doc. No. 25]. The Court granted the motion to amend and granted in part and denied in part Fujistar's motion for summary judgment [Doc. No. 33]. Specifically, the aspect of Fujistar's motion for summary judgment on Plaintiff's claims that Fujistar breached implied or express warranties under the TUCC as the manufacturer or seller of the shirt machine to Plaintiff

was granted and those claims were dismissed with prejudice.  The aspect of Fujistar's motion which sought summary judgment on Plaintiff's remaining claims against Fujistar was denied.

**B.      Factual**

Fujistar has submitted excerpts from the deposition of Richard Strickland ("Strickland") [Doc. No. 41-2] and a copy of the instruction manual for the shirt machine [Doc. No. 49-2] in support of its motion for summary judgment.  Nabors has submitted excerpts from the Plaintiff's deposition [Doc. No. 39-2], excerpts from the deposition of Strickland [Doc. No. 39-3], excerpts from the deposition of Nabors [Doc. No. 39-4], and excerpts from the deposition of Tony Haddad ("Haddad") [Doc. No. 39-5] in support of his motion for summary judgment. The contract between Fujistar and Widmer Cleaners, the original purchaser of the shirt machine, is also attached to Nabors' motion for summary judgment [Doc. No. 39-5 at 2].  As part of her response to Nabors' and Fujistar's motions for summary judgment, Plaintiff has submitted the affidavit of Strickland [Doc. No. 47-2], her affidavit [Doc. No. 47-3], portions of her deposition [Doc. No. 47-4] and portions of Haddad's deposition [Doc. No. 47-5].

In support of her motion for summary judgement on the counterclaim asserted by Nabors regarding a promissory note, Plaintiff has filed her affidavit [Doc. No. 56-3] and the affidavit of Strickland [Doc. No. 56-2].  Nabors has submitted his affidavit [Doc. No. 61-2] in support of his response in opposition to Plaintiff's motion for summary judgment.

**1.      The Invoices**

The invoice for the sale of the shirt machine from Fujistar to the original purchaser, Widmer Cleaners, states in pertinent part:

> LIMITATION OF WARRANTIES.  All warranties, if any, relating to the equipment sold pursuant to this contract come directly, and in

writing, from the manufacturer of the equipment, and not from seller. No statements made by seller, nor any action or inaction by seller, nor any trade custom or course of dealing with seller, shall create any warranty, expressed or implied on the part of the manufacturer. No statement made by the manufacturer, nor any action or inaction taken by the manufacturer, nor any trade custom or course of dealing with the manufacturer, shall create any warranty, express or implied, on the part of the seller. Buyer acknowledges that upon delivery he inspected the equipment and it was in good order and condition. As to the Seller, buyer acknowledges purchase of the equipment is on an "as is" basis with out warranty of any kind, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose, and that any warranties come from the manufacturer.

[Doc. No. 39-5 at 2].

The invoice for the sale of the shirt machine from Nabors to Plaintiff/Preferred Cleaners, dated September 28, 2005, states the shirt machine was sold to Preferred Cleaners for $57,000.00 [Doc. No. 39-3 at 6]. The single-page invoice lists the component parts of the shirt machine as follows:

| Description | Model # | Serial # | Price |
|---|---|---|---|
| Fujistar cuff and collar press | FTP555A | 117 | $15,000.00 |
| Fujistar sleeve press | YPS812E | 123 | $14,7000.00 |
| Fujistar body press | FDB002A | 2286 | $25,300.00 |
| Fujistar collar form | FDB921 | 154 | $ 2,000.00 |
| **Total Due** | | | $57,000.00 |

## 2.     The Instruction Manual

The cover of the instruction manual states "Manufacturer: Y. A. C. Co., Ltd. (Japan)" [Doc. No. 49-2]. The manual also sets forth the warranties on the shirt machine as follows:

### 1.2 Warranties

The warranty system of this system is as shown below;

1) Warranty Period
Parts ------ One (1) year after on-site acceptance
Labor ----- One (1) after on site acceptance

2) Exceptions of warranty

Even in the warranty period, warranty is not applied in the following cases.
a. The damages and failures caused by user's wrong handling or improper operation
b. The damages and failures caused by reasons belonging to the user's facility.
c. The damages and failures caused by natural calamities and any other reasons on which vendor is not liable.

*Id.* at 7. The manual further states that "[a]ll the copyrights of this document belong to Y.A.C. Co., Ltd. . . ." [*Id.* at 6].

### 3. The Promissory Note

A handwritten promissory note for $10,000.00 executed by Strickland on March 15, 2006, states:

> For value received, RICHARD STRICKLAND DBA Preferred Cleaners promises to pay, to the order of Robert E. Nabors, 184 Thorncrest Drive, Ringgold, Ga., the principal sum of Ten thousand Dollars ($10,000.$\underline{^{00}}$) plus $1,000.$\underline{^{00}}$, for a total of Eleven Thousand Dollars ($11,000.$\underline{^{00}}$) on or before <u>April 15, 2006</u>.

[Doc. No. 9-2]. Strickland signed the handwritten promissory note on a signature line which reads "Richard Strickland/DBA Preferred Cleaners." [*Id.*].

### 4. Strickland

Strickland is Plaintiff's son and the operations manager for Preferred Cleaners [Doc. No. 39-3 at 2-3, Doc. No. 47-2 at 1-3]. Strickland avers he has known Nabors for several years, and, after

attending a trade show, he met with Nabors and told him he was interested in both the Fujistar and Sankosha shirt machines [Doc. No. 47-2 at 1-3]. Strickland decided the Fujistar shirt machine was too expensive and "decided that we would probably buy the Sankosha machine." [*Id.* at 1].

Strickland stated he had seen a Fujistar machine demonstrated at a trade show in June or July of 2005, and was pleased with it [Doc. No. 39-3 at 8, deposition at 19-20]. During the trade show, he spoke with Ron Shubert ("Shubert") at a Fujistar booth about a machine [*id.*]. Strickland stated that Fujistar had a banner on its booth that said "200 shirts per hour and the world's finest quality." [*Id.*, deposition at 20].

Strickland stated he had seen advertisements about the Fujistar shirt machine before he spoke with Nabors about it [*id.* at 18, deposition at 68-69]. The advertisements stated the machine would do 200 shirt per hour [*id.*, deposition at 69]. When he asked Nabors about the Fujistar machine, Nabors told him that his impression was it produced "the best shirt I've ever seen." [*Id.*]. Strickland stated he was more interested in a Fujistar machine based upon Nabors' statement [*id.*].

Strickland stated he went to Nabors about buying a machine from Fujistar or Sankosha because Nabors was in the business of buying and reselling drycleaning machines [*id.* at 9-10, deposition at 25-26]. Strickland stated he had a discussion with someone at Fujistar who told him to speak with Nabors [*id.*, deposition at 27]. Strickland stated when he spoke with Nabors, Nabors told him he had purchased three machines from Fujistar "and that he was going to be the local representative." [*Id.*].

After the trade show, Strickland saw an advertisement in American Drycleaner magazine listing the shirt machine for sale for $45,000.00 [*id.*, deposition at 21]. Strickland believes he saw the advertisement for the shirt machine in either July or August 2005, but it could possible have been

September 2005 [*id.*]. Strickland stated he called the owner of the shirt machine, Steve Carico ("Carico") at Widmer Cleaners, who told him he had recently sold the machine to Nabors [*id.* at 8-9. deposition at 21-22, 24].

Strickland did not ask Carico if the machine pressed 200 shirts per hour, nor did he ask Carico if there was a warranty on the machine [*id.*, deposition at 23]. Strickland also stated he did not ask Carico if the shirt machine had damaged any shirts; however, he stated that Carico told him the machine was in fine working order [*id.*]. Carico said he had used the shirt machine and had not had any major problems with it [*id.* at 19, deposition at 71-72]. Strickland stated he relied on Carico's representation the shirt machine was in fine working order [*id.*, deposition at 73].

Strickland stated he had not discussed purchasing the shirt machine with Nabors prior to his conversation with Carico, although he stated he may have told Nabors he was interested in the machine [*id.* at 9, deposition at 24]. Strickland testified:

> At this time, Fujistar had started advertising a lot. We saw the faster, finest quality issues. Mr. Nabors had informed me that he was thinking of becoming a distributor for Fujistar, and that he had been out to California to look at it, and that the quality of shirt that the Fujistar produced was better than what I was getting off the Sankosha, so I started to investigate it further.

[*Id.*, deposition at 25].

Strickland stated that after Carico told him Nabors had purchased the shirt machine he called Nabors because he already knew him [*id.*, deposition at 29]. Nabors told Strickland the machine was six months old [*id.*]. Strickland stated Nabors told him Fujistar would provide a new warranty on the machine [*id.*]. When asked what Nabors meant by a "new" warranty, Strickland stated:

> That the machine was essentially a brand new machine and so, therefore, it would be covered under any warranty by Fujistar.

[*Id.*]. Strickland stated he "got the impression" from Nabors the warranty would start from the date he purchased the machine and would be a one-year warranty [*id.* at 11, deposition at 30]. However, Strickland also acknowledged he knew the shirt machine was not a brand new machine because he was aware it was at least six months old and had been sold to Widmer Cleaners and then to Nabors [*id.*]. Strickland also stated Nabors said "the warranty would be covered by Fujistar," but that Nabors did not say that it would be a new warranty, nor did he say it would start the day the shirt machine was purchased from Nabors [*id.*, deposition at 31]. Strickland also admitted that at the time of his conversation with Nabors he did not know the warranty was a one-year warranty [*id.*]. Strickland stated that after he purchased the shirt machine he spoke with Fujistar and learned the warranty on a brand new machine was a one-year warranty [*id.*, deposition at 31-32].

Nabors told him the shirt machine would work better than a Sankosha machine or he would give the shirt machine to Strickland [*id.*, deposition at 32]. Strickland stated he did not literally believe Nabors would give him the shirt machine for free, but he thought Nabors statement was a way of "putting it out there that [the shirt machine] is going to do the job." [*Id.*, deposition at 33]. Nabors also told him the shirt machine would not do well on really big shirts [*id.*].

Strickland stated Nabors also suggested he call Haddad [*id.* at 12, deposition at 35]. Strickland called Haddad to assure himself there was a new warranty on the machine [*id.,* deposition at 37]. When asked what he meant by a new warranty, Strickland replied, "Just that the machine would be covered by the manufacturer if there were anything defective in it." [*Id.*]. Strickland stated he was under the assumption the shirt machine would be covered by a one-year warranty starting from the day he "fired the machine up." [*Id.*].

During their conversation, Haddad told Strickland the machine was covered under warranty,

but Haddad did not tell him the length of the warranty [*id.* at 13, deposition at 38]. Haddad also confirmed the age of the shirt machine [*id.*, deposition at 41]. Haddad did not make any statement about the length of the warranty during their conversation and he did not tell Strickland he had disclaimed any warranties when he sold the shirt machine to Widmer Cleaners [*id.*, deposition at 31]. When asked to specifically describe the warranty that Haddad had allegedly promised to him, Strickland testified:

> All that was said was that the machine was covered under the manufacturer's warranty, and I assumed that it would be a full one-year warranty, as I said earlier.

[*Id.* at 16-17, deposition at 61-62].

Strickland stated that when he said he "assumed it would be a full one-year warranty" that "[n]o one ever told me anything to confirm or deny that." [*Id.* at 17, deposition at 62]. Strickland further testified that when he stated he assumed the warranty would be a full one-year warranty covering parts, but not labor that "it's just industry standard. No one told me that." [*Id.*, deposition at 62]. Strickland testified Haddad and Nabors told him the machine would be covered under the manufacturer's warranty prior to the time he purchased the machine [*id.*, deposition at 62-63].

Nabors told Strickland any warranty would come from Fujistar, the manufacturer [*id.* at 20, deposition at 76-77]. After being shown the invoice for the purchase of the shirt machine from Nabors, Strickland admitted there was nothing on the invoice that indicated Nabors was acting on behalf of Fujistar or anyone else [*id.*, deposition at 77]. Strickland also admitted he did not receive any written warranty concerning the shirt machine from Nabors [*id.* at 23, deposition at 86].

Strickland admitted his beliefs about a warranty and the level of production that could be achieved with the shirt machine was ultimately based on his conversation with Haddad [*id.* at 21,

deposition at 78]. When asked what claim he made to Fujistar concerning any warranty on the shirt machine, Strickland stated he made no written claims or requests to Fujistar [*id.* at 22, deposition at 82]. Strickland stated that "[a]ll that I asked for was that the machine provide me with the quality of product that I had asked for, and whatever it took to do that is what I expected to be done. If that meant replacing parts, that's great. If it meant replacing pads and covers, that's great. I just wanted it to work [*id.*, deposition at 82-83].

Strickland stated he purchased the shirt machine in September 2005 and it was delivered the same month [*id.* at 15, deposition at 57]. Strickland testified he received a manual from Nabors for the shirt machine at the time he purchased it, but said he found no mention of a warranty in the manual when he looked for it after he experienced problems with the shirt machine [*id.*, deposition at 39].

Strickland stated the purchase price for the shirt machine from Nabors was $57,000.00 [*id.* at 14, deposition at 49]. Strickland stated Fujistar would have been willing to sell him a new shirt machine for $58,000 plus delivery costs [*id.* at 20, deposition at 74-75]. Strickland stated Nabors' asking price of $57,000 was consistent with the shirt machine being a new machine [*id.*].

Strickland did not speak, or did not recall speaking, with anyone at Fujistar except for Haddad prior to the purchase of the shirt machine [*id.* at 24, deposition at 91]. Strickland did not pay Haddad or anyone else at Fujistar anything in connection with the purchase of the shirt machine [*id.*]. Strickland did not pay Haddad or anyone at Fujistar for any training in connection with the shirt machine [*id.*].

Strickland states when the shirt machine was installed, "Haddad came to Chattanooga to show me how to use the machine," but the "machine never operated correctly"[Doc. No. 47-2 at 2].

Strickland avers "[t]he quality of the shirts that came off the Fujistar machine was so bad" the machine has not been used and has been in storage [*id.* at 3-4]. Strickland further states that, after it was determined the shirt machine would not work, he called Haddad about the warranty and had several conversations with Haddad [*id.* at 4]. Strickland avers Nabors informed him "Haddad was not going to do anything about the problems." [*Id.*].

Strickland also avers:

> I have done everything that I could think of to get the machine to
> work properly. . . .

[*Id.*]. Strickland testified he could not get either the quality or quantity of pressed shirts he expected from the shirt machine [Doc. No. 39-3 at 7, deposition at 12]. He stated the shirt machine was never tried at full speed because of quality issues [*id.*]. Strickland stated the shirt machine was used for three days and then the Plaintiff's previous shirt machine was reinstalled [*id.*, deposition at 13]. Strickland stated the Plaintiff's "old" machine pressed 45 to 50 shirts per hour [*id.*].

Strickland stated he executed the promissory note, but it involved a separate deal between himself and Nabors [*id.* at 14, deposition at 49]. With respect to the promissory note, Strickland avers:

> He had discussed with Robert Nabors borrowing ten thousand dollars
> ($10,000.00) prior to March 15, 2006. Mr. Nabors agreed to lend
> him ten thousand dollars ($10,000.00) to open another cleaners
> located on East Brainerd Road. His mother, Rachel Gregg, did not
> know of his plans, and he asked Mr. Nabors not to tell her as he
> wanted it to be a surprise for her. Mr. Nabors wrote out the
> promissory note . . . prior to [Strickland's] picking up the ten
> thousand dollar ($10,000.00) check. Mr. Nabors had written in all of
> the writing on the note except for [Strickland's] signature. He signed
> the note and received the ten thousand dollars ($10,000.00).
> [Strickland] had never done business as Preferred Cleaners. He then
> took a business license out as Preferred Cleaners of East Brainerd.
> [Strickland] entered into the lease himself personally for the premises

in East Brainerd.. He did not get a copy of the note and did not notice that Mr. Nabors had written out "d/b/a/ Preferred Cleaners." [Strickland] has no interest in Preferred Cleaners. After the incidents that took place involving the purchase of the Fujistar machine, it was decided that [Strickland's] mother's business, Preferred Cleaners, would operate the East Brainerd store. The lease is still in [Strickland's] name because of the fact that the company has gone into bankruptcy and the landlord would not allow a shift in the least. [Strickland] intended the note to be only for him as a personal note and Mr. Nabors had knowledge of that.

[*Id.* at 1-2].

### 5.     Plaintiff

Plaintiff avers:

She is the owner of Preferred Cleaners. She talked to [Nabors] about purchasing the Fujistar machine. In her conversation with Mr. Nabors, she stated that it was a used machine. Mr. Nabors became very upset about this and insisted that this machine was the same as a new machine with a new machine warranty. This conversation occurred in her place of business, and the very same conversation occurred after the machine was delivered to his warehouse.

Mr. Nabors advised her that he was a distributor for Fujistar. She paid for the machine with a check from First Bank from the money she borrowed to buy this machine. It was endorsed by [Nabors] for Fujistar Distributors in the amount of fifty-seven thousand dollars ($57,000.00). A copy of that check is attached to this affidavit. . . . .There were other conversations with Mr. Nabors in which he advised both affiant and the loan officer for First Bank of Tennessee that the machine would do (200) shirts per hour. Mr Nabors stated to the loan officer from the First Bank and for her that if it did not do one hundred fifty (150) shirts per hour with better quality than her Sankosha Machine, he would give her the machine. He had also told her on another occasion that if it did not do the two hundred (200) shirts an hour, he would give her the machine. The machine does not operate properly. She wants her money back and not the machine. She told Mr. Nabors that also. The machine does not do her any good if it does not operate properly. She has also seen ads prior to purchasing this machine which said it would press two hundred (200) shirts per hour. The machine did not do that. She saw the one year warranty from the manual prior to the purchase of the machine. A copy of the warranty is attached hereto as Exhibit B.

12

Neither Fujistar nor Mr. Nabors honored this warranty.

[Doc. No. 47-3 at 1-2].

Plaintiff testified she had a conversation with Shubert about two weeks prior to the purchase of the shirt machine [Doc. No. 39-2 at 2, deposition at 6-7]. Plaintiff stated she was trying to confirm the price of a new Fujistar machine and she asked Shubert what a new Fujistar machine would cost [*id.*, deposition at 7]. Plaintiff stated the conversation was quite short and she never discussed a warranty with Shubert, she only asked him the price of a new Fujistar shirt machine [*id.*, deposition at 7-8]. Plaintiff stated that other than a video and brochure obtained by Strickland, neither she nor anyone else at Preferred Cleaners received any written statement or document from Fujistar prior to the purchase of the shirt machine [*id.*, deposition at 8-9].

Plaintiff testified she first met Nabors in 1996 [*id.* at 4, deposition at 22]. She stated she used Nabors' services in connection with her dry cleaning business and that Nabors trained Strickland in connection with certain aspects of the dry cleaning business [*id.*, deposition at 22-23]. Plaintiff stated Strickland worked for Nabors for about one year [*id.*, deposition at 23]. Plaintiff stated prior to September 2005, she and her son considered Nabors to be a friend [*id.* at 5, deposition at 27]. Plaintiff also stated Nabors loaned her money prior to 2005 [*id.*, deposition at 26].

Plaintiff testified it was primarily Strickland who conducted research and made the inquiries in connection with the purchase of the shirt machine [*id.*]. Plaintiff testified she purchased the shirt machine with the expectation it would increase the wholesale aspect of her dry cleaning business [*id.* at 6-7, deposition at 33-34]. Plaintiff stated that prior to the purchase of the shirt machine, she had at least two conversations with Nabors about the purchase and she saw a videotape about the shirt machine [*id.* at 7, deposition at 34]. Plaintiff testified that based upon her conversations with

Nabors and the videotape, she had certain expectations concerning the performance of the shirt machine, namely, the number of shirts it would clean per hour – 200 – and the quality of the shirts that would come off the machine [*id.*, deposition at 35].

Plaintiff stated that Nabors told her the shirt machine was "the same as a new machine, with a full warranty." [*Id.* at 8, deposition at 50]. Plaintiff stated she had concerns about whether the shirt machine would actually process 200 shirts per hour and the quality of the shirts and that Nabors told her he would give her the machine if it did not perform better than a Sankosha shirt machine [*id.*]. Plaintiff stated if the machine did not work in terms of quantity or quality, she wanted her money back [*id.*]. Plaintiff also testified that prior to her purchase of the shirt machine, she was aware that Nabors had never had a Fujistar shirt machine in operation [*id.*, deposition at 51].

Plaintiff also acknowledged she knew the machine was not a new machine, but she stated Nabors "insisted that it was a new machine with a new warranty." [*Id.* at 9, deposition at 56]. Plaintiff stated Nabors told her the shirt machine would perform better than a Sankosha shirt machine "and produce the shirts you need or I will give it to you." [*Id.*]. Plaintiff stated that prior to committing to buying the shirt machine, she told Nabors she would hold him to the aforementioned promise and Nabors told her he had no problem with that [*id.*, deposition at 57].

Plaintiff testified that while she was inspecting the shirt machine with Nabors, she referred to the machine as a used machine [Doc. No. 47-4 at 1, deposition at 49]. Plaintiff stated that Nabors because "very upset about that and insisted that this was the same as a new machine, with a new machine warranty." [*Id.*]. Plaintiff stated that Nabors represented to her that the machine was the same as new one [*id.* at 2, deposition at 50].

Plaintiff testified she and Nabors continued their discussion and she

> still had my apprehensions about these 200 shirts per hour and the quality fact, and he said, look, if it doesn't do better than a Sankosha, what you've got now, I'll give it to you.
>
> And I said to [Nabors], . . . I don't want a machine that won't work. I'll want my money back. So that was the parameters of the agreement, so to speak.

[*Id.*]. Plaintiff further testified her conversation with Nabors took place when she went with a representative of First Bank, who was spearheading the loan to purchase the shirt machine, to inspect it [*id.* at 4, deposition at 55]. Plaintiff stated:

> And when we went to Red Bank, we were fully expecting to see the machine in operational mode, but when we got there, we went up some steps into, like, an open area, and Bob had the machine all set up and said he didn't have a boiler connected, or something, so he couldn't show us the machine, but he had it - - it looked nice, except for the fact that it needed new pads and covers.

[*Id.*]. Plaintiff stated she and a representative of First Bank inspected the machine [*id.*]. She further stated:

> There wasn't any dings on [the shirt machine], or whatever. Bob said, if there's anything wrong with this machine, we'll fix it for you. This is a new machine. I mentioned to him twice or three times, during that conversation, that this was a used machine, and he insisted that this was a new machine with a new warranty.

[*Id.* at 4-5, deposition at 55-56]. Plaintiff stated she knew the shirt machine was not a new machine and she told Nabors so [*id.* at 5, deposition at 56]. She stated Nabors "insisted that it was considered a new machine, that it had not been used, that it was considered a new machine." *Id.* Plaintiff testified:

> I took Mr. Nabors at his word. I told him specifically that I would expect that machine to perform as he had said it would, or I would have - - I would need to have recourse.
>
> And he said to me, this machine will do better than your Sankosha and produce the shirts you need or I will give it to you. And I said to him, Bob, I'm going to hold you to that. And he said,

I don't have any problems.

[*Id.* at 5-6, deposition at 56-57]. Plaintiff testified she never spoke with Haddad [*id.* at 6, deposition at 57].

With respect to the promissory note, Plaintiff avers:

> She did not have any knowledge of the ten thousand dollar ($10,000.00) note signed by Richard Strickland to Robert E. Nabors until after the suit was filed herein. She is the sole owner of Preferred Cleaners and Richard Strickland has no ownership interest in the cleaners. She is the only person to do business as Preferred Cleaners and she never gave Richard Strickland authority to sign any note for Preferred Cleaners.

[Doc. No. 56-3].

### 6.    Nabors

Nabors testified he was retired but had recently been involved in the dry cleaning business [Doc. No. 39-4 at 2, deposition at 5]. Nabors stated he had a very cordial relationship with the Plaintiff beginning in the 1990's [*id.* at 3, deposition at 14]. Nabors stated Strickland came to work for him after Plaintiff told him it was her goal to buy a dry cleaners [*id.*]. Nabors said Strickland worked for him in the late 1990's, probably 1999, for a matter of months [*id.*, deposition at 15]. Nabors stated that after Strickland worked for him, Plaintiff began dry cleaning all of his shirts [*id.*]. Nabors guessed that this began in 2003 [*id.*].

Nabors stated he met Haddad in early 2005 [*id.*, deposition at 16]. Nabors testified he met Haddad:

> [A]fter I decided that I would try to sell some new equipment. This was after I had sold my cleaners and I needed something to occupy my time, so I did research on nearly all the major manufacturers. I went to the Unipress plant in Tampa, to the Forenta plant, in Morristown, Tennessee, and I had seen the ads for the FujiStar, and I called to tell him that I was coming out to see the equipment in

> operation at some of his plants that he had sold equipment to, to
> determine whether that was the model I wanted to sell or some other.

[*Id.*].  Nabors stated that he was excited about the Fujistar machines "because, in the drycleaning business, the shirt pressing, shirt laundry presents a problem for most drycleaners, and it was a matter to help some people I had known over the years." [*Id.* at 4, deposition at 22].

Nabors stated that although he talked to people about the Fujistar machines, if someone called Fujistar and bought a machine, Nabors would not have received a commission on the sale [*id.*].  Nabors stated that unless he bought the machine in advance and paid for it himself, he would not receive anything [*id.*, deposition at 23].  Nabors testified he "had to pay for [the shirt machine] in advance, there was no commission involved." [*Id.*].  Nabors stated he sold two Fujistar machines, one to Plaintiff and the other to Mr. Teeter ("Teeter") and Old Fort Cleaners in Fort Oglethorpe, Georgia [*id.*].  Nabors stated he had received complaints from Teeter about the machine he purchased; namely:

> Only on his production amount.  He's happy with the quality and the
> reliability of the machine, and it's – but he hadn't ever got the quality
> – quantity of shirts per hour that he expected.

[*Id.*].  Nabors stated to the best of his recollection, he sold a machine to Teeter prior to selling the shirt machine to Plaintiff [*id.*, deposition at 24].

Nabors stated that prior to his purchase of the shirt machine from Widmer Cleaners, Strickland told him about it [*id.* at 5, deposition at 30].  Nabors testified Strickland told him "[t]hat he had seen an ad in the American Drycleaner, so I called and made an appointment to drive to Cincinnati, to look at it.  When I got there, it looked extremely well. . . ." [*Id.*, deposition at 30-31].  Nabors stated that after talking with Strickland, "the next day or two, or the next week, I went to Cincinnati and purchased" the shirt machine [*id.*, deposition at 31].  Nabors stated he purchased the

shirt machine to resell it, but, at the time he purchased it, he did not know Strickland was interested in purchasing it [*id.*]. He stated he felt sure he could find someone who was interested in purchasing the shirt machine [*id.*]. Nabors also stated he did not purchase the shirt machine immediately, he returned to Cincinnati to purchase the machine either a few days after looking at it or the next week [*id.*, deposition at 32-33]. Nabors also stated that when he inspected the shirt machine in Cincinnati, it had already been taken out of operation [*id.*, deposition at 32]. Nabors purchased the shirt machine for $45,000.00 [*id.*, deposition at 32].

Nabors testified that before Plaintiff purchased the shirt machine from him, he suggested they go to a show in Orlando to see a Fujistar machine in operation [*id.* at 6, deposition at 70]. Nabors testified Plaintiff could not go to Fort Oglethorpe to see the machine Teeter had purchased in operation, because Teeter's machine was not in operation at that time [*id.* at 70-71]. Nabors testified he also told Plaintiff that Haddad would pay her expenses to California to look at Fujistar machines [*id.*, deposition at 70].

With respect to the promissory note, Nabors avers in pertinent part:

> 2.  Prior to the execution of the promissory note by Richard Strickland DBA Preferred Cleaners, Richard Strickland had previously signed checks to me on behalf of Preferred Cleaners.
>
> 3.  At all times material with regard to the execution of the promissory note and the providing of the loan, Richard Strickland indicated to me that he had the authority to act on the behalf of his mother and her company, Preferred Cleaners.
>
> 4.  At no time did Richard Strickland instruct me not to discuss this note with Rachel Gregg.
>
> 5.  At no time prior to or at the time of the execution of the note did Richard Strickland indicate to me that he

intended the note only to be a personal note.

[Doc. No. 61-2 at 1-2].

### 7.    Haddad's Testimony

Haddad's testified Fujistar buys dry cleaning equipment from various factories, puts a Fujistar sticker on it, and sells it [Doc. No. 47-5 at 4, deposition at 9]. Haddad testified Fujistar does not have a contract with Y. A. C. Co., Ltd. (Japan), the manufacturer of the shirt machine, but he has sold a number of their machines [*id.* at 6-7, deposition at 28, 30]. Haddad stated when he sells a machine neither he nor his corporation gives a warranty on the machine. Instead, the warranty comes from the factory and the written warranty for the machine is in the manual [*id.* at 7, deposition at 30]. Haddad stated there is generally a one-year factory warranty on each machine he sells and that whoever sells the machine also services it [*id.*]. Specifically, he testified:

> Whoever sells it. Let's say if somebody in Chattanooga bought it, the person in Chattanooga will service it. I do promise that I'll come over and start you up and train you for one day. That's all that I do.

[*Id.*].

With regard to his relationship with Nabors, Haddad stated there was

> an exchange service. He came and help me in one of the trade shows, I didn't pay for his ticket, so I didn't charge him [for the trip to Chattanooga to train Plaintiff on the Fujistar machine]. It's like an exchange. And he invited me to sleep at his guest room. It's something between me and Robert.

[*Id.* at 8-9, deposition at 40-41]. Haddad testified he was "just trying to establish a relationship with Nabors. But, you know, it broke down there." [*Id.* at 9, deposition at 41].

It appears, Haddad testified that he talked to Strickland about the shirt machine in June 2005 [*See* Doc. No. 39-5 at 4, deposition at 37]. Haddad stated the machine was not installed by Plaintiff

until the end of January 2006 or February 2006, so the warranty on the machine was expired by the time it was installed [*id.*].

Haddad stated he came to Chattanooga in January 2006 [*id.*, deposition at 38]. Haddad stated this was his second trip to Chattanooga [*id.*]. Haddad testified he met Strickland at that time, but there was no discussion about the warranty [*id.*]. Haddad stated that on his second trip:

> I wanted to be sure – [Nabors] called me and said, You know, they're ready to start [the shirt machine] up. I said . . . do they have electric, do they have steam, do they have air compressor? Well, I'm not sure . . . because I don't want to fly all the way from Los Angeles. This was my fear, that it wasn't ready. And I spoke with [Strickland], he said, Yes, everything is there, that's what Strickland said, We're ready for you. . . .

[*Id.*]. Haddad testified that when he arrived in Chattanooga:

> nothing was ready. Oh, will be ready in one hour, be ready in ten minutes. We go and come back, they were not even to fire-up the steam until like 3:00 . . . I don't remember when. Then we start – you know, I start rigging the machine, changing covers, and I ask them, Okay, where is the crew that you want me to train? Oh, there's no crew, that's [Strickland] . . . train me and I'll train them. I said, I need to train three people on this machine. [Strickland] [s]aid, Don't worry, I'm expert, I know what to do, just train me and I'll train them. I really did not like that. . . .

[*Id.*, deposition at 39]. Haddad stated he started the training and did between four and seven shirts and Strickland told him he had to leave because an inspector was coming [*id.*, deposition at 39-40].

Haddad testified Nabors did not pay for his airline ticket to Chattanooga [*id.*, deposition at 40]. Haddad stated that Nabors traveled and helped him at a trade show and that he did not pay for Nabors' airline ticket at that time, so he did not charge Nabors for his airline ticket to Chattanooga [*id.*].

## III. Analysis

### A. Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Id.* A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.

### B. Fujistar's Motion

Previously, Plaintiff's claims against Fujistar, with the exception of Plaintiff's claims for misrepresentation, were dismissed [Doc. No. 33]. Specifically, the Court found based on the record developed at the time that: (1) a genuine issue of material fact existed as to whether Haddad provided or misrepresented some type of warranty on the shirt machine prior to the time Plaintiff purchased

it from Nabors [*id.* at 13], and (2) there was a genuine issue of material fact based upon Strickland's alleged conversation with Haddad concerning the shirt machine and warranty as to whether Plaintiff's economic loss injury was caused by its reliance on the alleged misrepresentations of Fujistar [*id.* at 14-15]. Fujistar has now supplemented the record with deposition testimony and documents which demonstrate it is entitled to summary judgment on Plaintiff's remaining claims against it.

With regard to Plaintiff's claims of fraud, the Court previously held:

> Clearly, there is a factual dispute regarding when the conversation(s) between Strickland and Haddad took place and what was said. The undisputed evidence is Fujistar sold the shirt machine to Widmer Cleaners. In doing so, it appears Fujistar disclaimed all warranties except the manufacturer's warranty. Strickland's affidavit does not state how Haddad allegedly confirmed a new warranty was being provided or if it was being provided by Fujistar. It is curious that Haddad would make or confirm a new warranty as alleged after disclaiming such warranties in the Widmer Cleaners transaction. Nevertheless, drawing all reasonable inferences in favor of the non-moving party as the Court must when ruling on a motion for summary judgment, the evidence, particularly the affidavits of Strickland and Haddad, creates a genuine issue of material fact as to whether Haddad provided or misrepresented some time of warranty on the shirt machine *prior* to the time Plaintiff purchased it from Nabors.

[Doc. No. 33 at 13].

With respect to Plaintiff's claims that Fujistar and Nabors fraudulently led Plaintiff to believe they would honor warranties and guarantees on the shirt machine, the Court previously held:

> Strickland's alleged conversation with Haddad concerning the shirt machine and new warranty, when viewed in the light most favorable to Plaintiff, sets forth an intentional misrepresentation of an existing material fact made with knowledge of the representation's falsity. Strickland's affidavit states he would not have recommended Plaintiff purchase the shirt machine had he not believed Fujistar had agreed to provide a new warranty on the machine. Thus, and again viewing the facts and all inferences in the light most favorable to Plaintiff as the non-moving party, Strickland's affidavit demonstrates there are genuine issues of material fact concerning the claim that Plaintiff's

> economic loss injury is cause by its reliance on the
> misrepresentation(s) of Fujistar.

[*Id.* at 14-15].

With regard to Fujistar's assertion it was entitled to summary judgment on Plaintiff's claims

of fraud because it had no pecuniary interest in the sale of the shirt machine from Nabors to Plaintiff,

the Court held:

> There is no documentary evidence in the record demonstrating Fujistar
> had any pecuniary interest in the sale of the shirt machine from Nabors
> to Plaintiff. Haddad, however, admits he traveled from Los Angeles,
> California to Chattanooga, Tennessee to train Plaintiff's employees to
> use the shirt machine after it was purchased. At this stage of the
> proceedings, it is a reasonable inference that Haddad did not travel
> from California to Tennessee to train Plaintiff's employees in the use
> of the shirt machine for purely gratuitous reasons. Thus, Haddad's
> involvement in training Plaintiff's employees creates a reasonable
> inference Fujistar had some interest in the sale of the shirt machine to
> Plaintiff, *possibly* pecuniary.

[*Id.* at 13-14].

Under Tennessee law, "[t]he essence of fraud is deception;" namely, "fraud is a trick or

artifice or other use of false information that induces a person to act in a way that he or she would

not otherwise have acted." *Lopez v. Taylor*, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005). Fraud

occurs when an individual either intentionally misrepresents a material fact or intentionally creates

a false impression in order to mislead another or to obtain an unfair advantage over him or her. *Id.*

To establish fraud in Tennessee, a plaintiff must show:

> 1) the defendant made a representation of an existing or past fact; 2)
> the representation was false when made; 3) the representation was in
> regard to a material fact; 4) the false representation was made either
> knowingly or without belief in its truth or recklessly; 5) plaintiff
> reasonably relied on the misrepresented material fact; and 6) plaintiff
> suffered damage as a result of the misrepresentation.

*Metropolitan Gov't of Nashville and Davidson County v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992).

"Reasonable reliance on the defendant's representations is an essential ingredient in [fraud claims]." *Hardcastle v. Harris*, 170 S.W.3d 67, 83 n.25 (Tenn. Ct. App. 2004) (citing *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992)). The issue of the reasonableness of a party's reliance on a misrepresentation "is a question of fact." *Pitz v. Woodruff*, M2003-01849-COA-R3CV, 2004 WL 2951979, * 10 (Tenn. Ct. App. Dec. 17, 2004)). Factors considered in determining the reasonableness of a plaintiff's reliance on a misrepresentation are:

> (1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation.

*Id.* (citing *J.C. Bradford & Co. v. Southern Realty Partners*, W1999-01617-COA-R3-CV, 2000 WL 34411153, * 10 (Tenn. Ct. App. Aug. 14, 2000)).

A successful claim for misrepresentation under Tennessee law "requires justifiable reliance." *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005). "To establish a *prima facie* case for negligent misrepresentation, the plaintiff . . . must show that [s]he justifiably relied upon a material misrepresentation made by an individual under a duty to properly inform as to the material facts." *Id.* (citing *Sears v. Gregory*, 146 S.W.3d 610, 621 (Tenn. Ct. App. 2004)). "The burden is not upon the defendant to show that it was not negligent, but rather, the burden is upon the plaintiff to show that its reliance upon any statements defendants may have made was reasonable." *Id.* at 408-09 (citing *Metropolitan Government of Nashville and Davidson County v. McKinney*, 852 S.W.2d 233 (Tenn. App. 1992)).

Viewing the evidence in the light most favorable to Plaintiff, she cannot show that she or Strickland reasonably relied on any alleged misrepresentation from Haddad/Fujistar which caused Plaintiff to sustain damages. First, Plaintiff never spoke with Haddad. Although the evidence shows Strickland did speak with Haddad prior to the purchase of the shirt machine from Nabors, Plaintiff cannot show Haddad negligently or fraudulently misrepresented that Fujistar would provide a new warranty on the shirt machine starting when Plaintiff purchased the machine from Nabors. The evidence does not even show Haddad's statements about the manufacturer's warranty on the shirt machine were false at the time made, much less that Plaintiff or Strickland relied upon them to Plaintiff's economic detriment. The undisputed evidence also shows Fujistar did not have any pecuniary interest in the sale of the shirt machine by Nabors to Plaintiff. Finally, the defendants both presented testimony indicating Nabors was not an employee or agent of Fujistar, and Plaintiff presented no genuine issue of material fact to the contrary.

Viewing the evidence in the light most favorable to Plaintiff, the undisputed evidence shows Plaintiff purchased the shirt machine from Nabors after Nabors bought it from Widmer Cleaners. The invoice for the sale of the shirt machine from Fujistar to Widmer Cleaners disclaimed all warranties, except the manufacturer's warranty and the manufacturer is not a party to this action. The manufacturer's warranty, which is set forth in the instruction manual, covered both parts and labor and ran for one year from on-site acceptance.

After learning the shirt machine was sold by Widmer Cleaners to Nabors, Strickland contacted Nabors who said the machine was six months old and Fujistar would provide a warranty on it. Strickland claims he got an impression the warranty would begin on the date he purchased the machine and would be a one-year warranty, but he acknowledged he knew the shirt machine was not

brand new. Strickland further admitted that although Nabors told him the warranty would be covered by Fujistar, Nabors did not say it would begin the day Plaintiff purchased the shirt machine from Nabors. Strickland also admitted it was not until after Plaintiff purchased the shirt machine that he spoke with someone at Fujistar and learned the manufacturer's warranty on a brand new machine was a one-year warranty.

Strickland stated he called Haddad at Fujistar at Nabors' suggestion. Strickland stated he made the telephone call to Haddad to assure himself there was a warranty on the machine. Strickland stated Haddad confirmed the age of the shirt machine and told him the machine had a manufacturer's warranty, but Haddad did not tell Strickland the length of the warranty or that Fujistar had disclaimed any and all warranties, other than the manufacturer's warranty, when the shirt machine was sold to Widmer Cleaners. Strickland made the *assumption* there would be a full one-year warranty from the day he started the shirt machine up. Haddad testified that by the time the shirt machine was installed by Plaintiff it was either the end of January 2006 or February 2006, so the manufacturer's warranty "was way past." [Doc. No. 39-5, deposition at 37]. No evidence has been presented that the one-year manufacturer's warranty had already expired at the time Haddad told Strickland there was a such a warranty.

Strickland stated Nabors--not Haddad-- told him that any warranty would come from Fujistar. However, Strickland agreed there was nothing on the invoice which indicated Nabors was acting on behalf of Fujistar or anyone else. Moreover, the single page invoice for the sale of the shirt machine from Nabors to Plaintiff says nothing about a warranty on the shirt machine. While Strickland claims he thought Fujistar was the manufacturer of the shirt machine and did not know any other name besides Fujistar, Strickland admits he received a manual for the machine at the time of the purchase

and Plaintiff said she had the manual prior to purchase. As noted, the front cover of the instruction manual identifies the manufacturer of the shirt machine as Y.A.C. Co., Ltd (Japan) and does not mention the name Fujistar. Moreover, the manual explains the manufacturer's warranty. Notably, no evidence has been submitted that Haddad ever told Strickland that Fujistar was the manufacturer.

Finally, the evidence shows neither Haddad nor Fujistar had any pecuniary interest in the sale of the shirt machine to Plaintiff. Haddad testified the reason he came to Chattanooga to train Strickland/Plaintiff's employees on the use of the shirt machine was based upon an exchange of services with Nabors. Haddad testified Nabors helped him out at a trade show. Since Haddad did not pay for Nabors' ticket on that occasion, he did not charge Nabors for his trip to Chattanooga to train Strickland/Plaintiff's employees in the use of the shirt machine. Haddad also testified he had been trying to establish a business relationship with Nabors, but it broke down. Although Nabors testified he was excited about the Fujistar machine after he saw one in operation and that he would talk to people about the machine, Nabors also testified he did not receive a commission on the sale of a shirt machine if that person called Fujistar and bought the machine. Rather, Nabors testified that unless he bought a shirt machine in advance and resold it, he did not receive anything in connection with the sale of a shirt machine.

Based upon the evidence in the current record, there is no genuine issue of material fact as to Plaintiff's claims of fraud against Fujistar. Plaintiff has adduced no evidence Fujistar misrepresented to Strickland that it would give Plaintiff a warranty on the shirt machine or that the warranty would run for one year from the date Plaintiff started using the shirt machine. Likewise, there is no evidence Haddad ever told Strickland that Fujistar was the manufacturer of the shirt machine. Even viewed in the light most favorable to Plaintiff, the evidence now shows that

Haddad/Fujistar did not defraud Plaintiff as a matter of law.

Accordingly, Fujistar's second motion for a summary judgment pursuant to Fed. R. Civ. P. 56 [Doc. No. 41] will be **GRANTED** and Plaintiff's remaining claims against Fujistar will be **DISMISSED WITH PREJUDICE**.

### C.    Nabors' Motions

Nabors has filed a motion to substitute exhibit [Doc. No. 61].  Nabors seeks to substitute his executed affidavit [Doc. No. 61-2] for his previously unexecuted affidavit which was inadvertently attached to his response in opposition to Plaintiff's motion for summary judgment on his counterclaim [Doc. No. 60-3].  No response has been filed to Nabors' motion to substitute by any party.  Accordingly, Nabors' motion to substitute [Doc. No. 61] will be **GRANTED**.

Nabors moves for summary judgment on Plaintiff's claims against him asserting this action "has arisen, not because of any fraud or improper actions committed against the Plaintiff by the Defendants, but rather, because of the Plaintiff's own inattention and/or failure to accept the training offered to permit the machines to function properly." [Doc. No. 40 at 3].  Nabors further asserts he:

> has not been sued in his individual capacity, but rather, only in his capacity as an employee and/or agent of the Defendant, YA Co. Co. Ltd. d/b/a Fujistar Shirt Systems.  As there is no claim asserted against him, individually, the entry of an order dismissing him is appropriate pursuant to F. R. Civ. P. 12(b)(6).

[*Id.* at 7].  Nabors next asserts that dismissal is appropriate as Plaintiff's claims of fraud are not adequately or specifically pled pursuant to Fed. R. Civ. P. 9(b).  *Id.*  He further asserts "Plaintiff's allegations are somewhat difficult to respond to as they do not appear to state a claim against the Defendant for which relief may be granted and, therefore, should be dismissed pursuant to F. R. Civ. P. 12(b)(6)." *Id.*  With regard to the merits of his motion for summary judgment, Nabors contends

there is no allegation of any representation concerning the existence of any warranty on the shirt machine from him [*id.* at 9].

### 1. Rule 12(b)(6)

In Plaintiff's complaint and amended complaint, Nabors is named as a defendant in the caption of the complaint. The complaint and amended complaint allege Nabors "is an employee and/or agent of the defendant [Fujistar]," [Doc. Nos. 1-2 at 1, ¶ 1; 34 at 1, ¶ 1], and the amended complaint asserts the defendants sold a Fujistar machine to Plaintiff with certain guarantees and warranties [Doc. No. 34 at 1-2, ¶ 2]. The amended complaint asserts the shirt machine does not comply with the guarantees and warranties provided by the defendants [*id.*]. Plaintiff's amended complaint also asserts the defendants refused to honor the guarantees and warranties, fraudulently led Plaintiff to believe they would honor such warranties and guarantees, and wholly and completely failed to honor the warranties and guarantees [Doc. No. 34 at 2, ¶ V]. In his answer, Nabors denied he was an employee or agent of Fujistar, and also denied the above noted allegations in Plaintiff's complaint [Doc. No. 9 at 2, ¶¶ 3-6].

Rule 12(b)(6) "requires the Court to construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff's allegations plausibly establish a case which would entitle the plaintiff to relief." *Gomez-Mesquita v. City of Detroit*, No. 06-12844, 2007 WL 2225859, * 1 (E.D. Mich. August 2, 2007) (citing *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S.Ct. 1955, 1968-70 (2007)). Rule 12(b)(6) also provides that if matters outside of the pleadings are presented and not excluded, the motion shall be treated as one for summary judgment and disposed of according to Rule 56. *Rose v. Hartford Underwriters, Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

Nabors cited no precedent concerning his claim for dismissal under Fed. R. Civ. P. 12(b)(6) because he allegedly has been sued only as an employee and/or agent of Fujistar. In addition, Nabors never moved for dismissal of the complaint pursuant to Rule 12(b)(6). Although Plaintiff alleges Nabors was an agent and/or employee of Fujistar, she also alleges Nabors sold her the shirt machine with certain guarantees and/or warranties which he has wholly failed to honor. While not flawlessly drafted, the allegations of the amended complaint, if proved, establish a basis for relief against Nabors, who the evidence has shown is not an employee or agent of Fujistar. In addition, as Nabors did not previously move for 12(b)(6) dismissal, to the extent he has done so in his memorandum in support of his motion for summary judgment, his motion must be treated as a motion for summary judgment and disposed of under Rule 56. *Rose*, 203 F.3d at 420. As is discussed more fully below in addressing the merits of Nabors' Rule 56 motion for summary judgment, Nabors is not entitled to a summary judgment under Rule 56 on Plaintiff's claims against him.

Nabors also asserts dismissal pursuant to Rule 12(b)(6) is appropriate because the Plaintiff's claims of fraud are not adequately or specifically pled under Fed. R. Civ. P. 9(b) and because Plaintiff's allegations do not state a claim against him for which relief may be granted. Nabors filed his answer on June 19, 2007 and his motion for a summary judgment on July 17, 2007, without moving for a more definite statement under Rule 12(e) or challenging the sufficiency of the averments of fraud under Rule 9(b). Even assuming *arguendo* that the allegations of fraud in the Plaintiff's amended complaint fail to satisfy the requirements of Rule 9(b), dismissal is inappropriate in the absence of a motion for a more definite statement under Rule 12(e). *See Coffey v. Foamex L. P.*, 2 F.3d 157, 162 (6th Cir. 1993). *See also Gillette Co. v. Philips Oral Healthcare, Inc.*, No. 99CIV0807LAPDF, 2001 WL 1442637, * 6 (S.D.N.Y. Nov. 15, 2001) (Failure to raise a Rule 9(b)

argument either with or before an answer normally operates as a waiver of that argument.). Thus, the Court will proceed to address Nabors' motion for summary judgment on the merits under Rule 56.

### 2. Rule 56

#### a. Breach of Warranties Claims

Nabors asserts he is entitled to summary judgment on Plaintiff's claims under the TUCC, namely, Tenn. Code Ann. §§ 47-2-313, 47-2-314 and 47-2-315 [Doc. No. 40 at 16-2]. Under the TUCC, a "seller" is "a person who sells or contracts to sell goods." Tenn. Code Ann. § 47-2-103(d). The TUCC also provides:

> . . . unless the context otherwise requires "contract" and "agreement" are limited to those relating to the present or future sale of goods. "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (§ 47-2-401). A "present sale" means a sale which is accomplished by the making of the contract.

Tenn. Code Ann. § 47-2-106(1).

With regard to express warranties, the TUCC provides:

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Tenn. Code Ann. § 47-2-313.

With regard to implied warranties, including fitness for the ordinary purpose, the TUCC

states, "[u]nless excluded or modified (§ 47-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Tenn. Code Ann. § 47-2-314(1). Lastly, with regard to an implied warranty of fitness for a particular purpose, the TUCC states in pertinent part:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose.

Tenn. Code Ann. § 47-2-315.

### (i) Tenn. Code Ann. § 47-2-313

Nabors acknowledges Tenn. Code Ann. § 47-2-313 provides "an express warranty may be created by an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis for the bargain." [Doc. No. 40 at 17]. Nabors asserts, however, that as a matter of law he made "no affirmation of fact or promise . . . concerning the goods that apply to this particular claim." [*Id.*].

Contrary to Nabors' assertions, however, a question of fact remains regarding whether he made certain affirmations of fact about the shirt machine. Viewed in the light most favorable to the Plaintiff, the evidence is that Nabors told her the shirt machine was the same as a new machine with a new, full warranty. Strickland said Nabors also told him Fujistar would provide a warranty on the machine. There is also evidence Nabors knew the quantity and quality of shirts pressed by the shirt machine were of the essence to the Plaintiff in purchasing the shirt machine and told her the shirt machine would perform better than a Sankosha shirt machine and produce the shirts needed or he would give it to her.

The Court finds a genuine issue of material fact as to whether Nabors' statements provided an express warranty under Tenn. Code Ann. § 47-2-313 as to the quantity and quality of the shirts that would be produced by the shirt machine. Accordingly, that aspect of Nabors' motion which seeks summary judgment on Plaintiff's claim against Nabors under Tenn. Code Ann. § 47-2-313 will be **DENIED**.

### (ii)    Tenn. Code Ann. § 47-2-314

Nabors asserts he is entitled to a summary judgment on Plaintiff's claims concerning an implied warranty of merchantability with regard to the shirt machine under Tenn. Code Ann. § 47-2-314 because he is not a merchant with regard to the shirt machine. Nabors further asserts that although Plaintiff claims the shirt machine does not satisfy her expectations as to the quantity and quality of the shirts it produces, Plaintiff has presented no evidence the shirt machine was damaged or defective at the time it was delivered to Plaintiff.

Tenn. Code Ann. § 47-2-314 states in pertinent part:

(1)    Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

(2)    Goods to be merchantable must be at least such as:

(a)    pass without objection in the trade under the contract description; and

(b)    in the case of fungible goods, are of fair average quality within the description; and

(c)    are fit for the ordinary purposes for which such goods are used; and

(d)    run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e)     are adequately contained, packaged, and labeled as the agreement may require; and

(f)     conform to the promises or affirmations of fact made on the container if any.

"For an implied warranty of merchantability to arise the seller must be a merchant." *In re Jackson Television, Ltd*, 121 B.R. 790, 792 (Bankr. E.D. Tenn. 1990).  Tenn. Code Ann. § 47-2-104 states:

(1) "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

The comments to Tenn. Code Ann. § 47-2-104 states:

1.  This Article assumes that transactions between professionals in a given field require special and clear rules which may not apply to a casual or inexperienced seller or buyer. . . .

2.  The term "merchant" as defined here roots in the "law merchant" concept of a professional in business.  The professional status under the definition may be based upon specialized knowledge as to the goods, specialized knowledge as to business practices, or specialized knowledge as to both . . . .

*Id.*  The term "merchant" in Tenn. Code Ann. § 47-2-314 "restricts the implied warranty to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods."  *In re Jackson*, 121 B.R. at 792.

"Under Tennessee law, implicit in a sale of goods by a merchant is a warranty that the product is suitable for the purpose for which it was sold."  *Wright v. Dow Chemical U.S.A.*, 845 F. Supp. 503, 510 (M.D. Tenn. 1993) (citing Tenn. Code Ann. § 47-2-314(2)(c)).  This implied warranty "arises from the sale itself."  *Id.* (citing 3 Ronald A. Anderson, *Anderson on the Uniform Commercial Code*

103 (3d ed. 1983)).

Again viewing the evidence and all reasonable inferences in favor of the Plaintiff, Strickland went to Nabors because Nabors was in the business of buying and reselling drycleaning machines. Nabors testified that after he sold his drycleaning business, he did research on nearly all the major manufacturers of drycleaning equipment to determine which models he wanted to sell. Thus, a genuine issue of material fact exists as to whether Nabors was a merchant of dry cleaning equipment under Tenn. Code Ann. § 47-2-314.

Strickland stated Plaintiff used the shirt machine for three days and then installed her old Sankosha shirt machine. Strickland stated that Preferred Cleaners was not able to present any shirt that had been pressed by the shirt machine directly to a customer. Strickland stated every single shirt that came off the Fujistar machine had to be "touched up" by hand. Again viewing the evidence in the light most favorable to the movant, as required, a genuine issue of material fact exists as to whether the quality of the shirts pressed or processed by the shirt machine was so consistently poor that the sale of the shirt machine breached the implied warranty of merchantability under § 47-2-314 of the TUCC.

Accordingly, that aspect of Nabors' motion which seeks summary judgment on Plaintiff's claim against Nabors under the Tenn. Code Ann. § 47-2-314, will be **DENIED**.

### (iii)     Tenn. Code Ann. § 47-2-315

Nabors asserts there is no implied warranty of fitness for a particular purpose in this instance because Plaintiff observed and/or inspected the shirt machine on Nabors' premises prior to purchasing it and the prior owner of the machine specifically told Strickland the machine was working prior to the purchase of the machine by Nabors. As discussed above with regard to Tenn.

Code Ann. § 47-2-313, Nabors allegedly was aware of the particular purpose for which the Plaintiff was purchasing the shirt machine. Viewing the evidence in the light most favorable to Plaintiff, Nabors was aware Plaintiff was purchasing the shirt machine for her wholesale drying cleaning business and that she indicated to Nabors that if the machine did not perform as to the quantity and/or quality which she needed, and which he represented the machine could perform, she would seek her money back.

The Court finds a genuine issue of material fact as to whether under the circumstances of Nabors' sale of the shirt machine to Plaintiff, there was an implied warranty of fitness for a particular purpose of the shirt machine under Tenn. Code Ann. § 47-2-315 as to the quantity and quality of the shirts that would be produced by the shirt machine. Accordingly, that aspect of Nabors' motion for a summary judgment which seeks summary judgment on Plaintiff's claim against Nabors under Tenn. Code Ann. § 47-2-315, will be **DENIED**.

### b.    Fraud Claims

Nabors asserts he is entitled to summary judgment on Plaintiff's claims of fraud. It is undisputed that Plaintiff knew that the shirt machine was not manufactured by Nabors, that the machine was at least six months old and not "brand new," and that Nabors had purchased the shirt machine from Widmer Cleaners. It is also undisputed that Strickland spoke with Haddad, who confirmed the existence of a manufacturer's warranty on the machine as well as the age of the shirt machine. It is undisputed that Strickland made certain assumptions about the warranty and the shirt machine. Nabors is correct that Plaintiff has not produced any evidence Nabors stated *he* would provide a warranty on the machine. There is, however, evidence that Nabors told both Plaintiff and Strickland that Fujistar would provide a warranty on the machine, and even told Plaintiff the warranty

was a new and/or full warranty.

Thus, the issue is whether a reasonable juror could find such statements by Nabors constitute a fraudulent misrepresentation or create a false impression because it is undisputed that Fujistar did not provide a warranty and/or because the manufacturer's warranty expired by the time Plaintiff attempted to place the shirt machine into operation. In Tennessee, fraud includes "those situations where a party, while not actually lying, intentionally 'produces a false impression in order to mislead another or to obtain an undue advantage over him . . . .'" *Tully v. USA Wireless, Inc.*, No. 01A01-9707-CH-00332, 1998 WL 195955, * 5 (Tenn. Ct. App. Apr. 24, 1998) (quoting *Haynes v. Cumberland Builders*, 546 S.W.2d 228, 232 (Tenn. Ct. App. 1976)). Under Tennessee laws, the intention to defraud is generally a question of fact that usually requires a trial before it can be fully developed. *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978).

Viewing all the evidence and inferences in the light most favorable to Plaintiff, she has established a genuine issue of material fact with respect to her fraud claims against Nabors. Accordingly, that aspect of Nabors' motion which seeks summary judgment on Plaintiff's claim of fraud against Nabors will be **DENIED.**

### c. Punitive Damages

Nabors also challenges Plaintiff's claim for punitive damages. In Tennessee, punitive damages are awarded "not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future." *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 900 (Tenn. 1992)). Tennessee "restrict[s] the awarding of punitive damages to cases involving only the most egregious of wrongs." *Id.* at 901.

"Under Tennessee law, 'a court may . . . award punitive damages only if it finds a defendant

has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.'" *Darling v. J. B. Expedited Servs., Inc.*, No. 2:05-cv-00017, 2006 WL 2238913, * 11 n. 2 (M.D. Tenn. Aug. 3, 2006) (quoting *Hodges*, 833 S.W.2d at 901). For purposes of punitive damages:

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation.

*Hodges*, 833 S.W.2d at 901 (internal citations omitted). In order to restrict the award of punitive damages to the most egregious of cases "a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Id.*

As discussed above, Nabors is not entitled to a summary judgment on Plaintiff's claims of fraud. Thus, that aspect of Nabors' motion for a summary judgment which seeks summary judgment on Plaintiff's claim for punitive damages against Nabors will be **DENIED**.

### 3. Plaintiff's Motion

Plaintiff asserts she should be granted a summary judgment on Nabors' counterclaim against her. She states she did business as and owns Preferred Cleaners. She states Strickland did not do business as Preferred Cleaners and merely signed the promissory note which had been written by Nabors. Plaintiff asserts Strickland understood the note to be in his individual capacity, even though he later discovered that Nabors had written in "d/b/a Preferred Cleaners." Plaintiff further asserts Strickland had no authority to sign a note on behalf of Preferred Cleaners and that Nabors knew he did not operate as Preferred Cleaners. Plaintiff states it was Strickland's intention to open a dry cleaning business on East Brainerd Road and surprise her. Plaintiffs affidavit states she is the sole owner of Preferred Cleaners and Strickland has no ownership interest in it. Plaintiff states she is the

only person to do business as Preferred Cleaners and never gave Strickland the authority to sign a note for her/Preferred Cleaners.  Plaintiff also states she had no knowledge of the promissory note until after this action commenced.

Strickland states Nabors agreed to lend him $10,000 to open another cleaners on East Brainerd Road, that Plaintiff did not know of his plans, and that he asked Nabors not to tell his mother about the loan because it was to be a surprise.  Strickland states Nabors wrote out the promissory note and he did not notice that Nabors had written "DBA Preferred Cleaners" on the promissory note.  Strickland states he has no interest in Preferred Cleaners, but that after the problems with the purchase of the shirt machine, it was decided Preferred Cleaners would operate the East Brainerd store.

With regard to the execution of the promissory note, Nabors' affidavit states Strickland indicated he had authority to act on behalf of Plaintiff, Strickland did not instruct him not to discuss the promissory note with Plaintiff, and at no time prior to the execution of the note did Strickland indicate he intended the promissory note to only be a personal note. Nabors asserts there are genuine issues of material fact concerning his counterclaim because of Strickland's apparent authority to act on behalf of Preferred Cleaners.  Nabors asserts the promissory note which Strickland executed speaks for itself and Strickland executed the note "DBA Preferred Cleaners."  Nabors also asserts that regardless of Strickland's personal intentions at the time he executed the note, Strickland and Plaintiff had long standing deadlines with Nabors and that Plaintiff acted on behalf of and under the recommendation of Strickland in conducting the affairs of Preferred Cleaners.

Viewing the evidence in the light most favorable to Nabors, there is a genuine issue of material fact as to whether Strickland was acting within his apparent authority when he signed the

promissory note. Although Strickland asserts that when he signed the promissory note he did not notice the note stated he was signing on behalf of Preferred Cleaners, the promissory note states Strickland is signing the note "DBA Preferred Cleaners" in the text of the note itself and on the signature line.

Accordingly, the Court finds there is a genuine issue of material fact as to as to Nabors' counterclaim against Plaintiff on the promissory note. Accordingly, Plaintiff's motion for a summary judgment [Doc. No. 56] will be **DENIED**.

## IV. Conclusion

For the reasons stated above:

(1) Fujistar's second motion for summary judgment [Doc. No. 41] is hereby **GRANTED** and Plaintiff's remaining claims against Fujistar are hereby **DISMISSED WITH PREJUDICE**;

(2) Plaintiff's motion for summary judgment on Nabors' counterclaim [Doc. No. 56] is hereby **DENIED**;

(3) Nabors' motion to substitute exhibit [Doc. No. 61] is hereby **GRANTED**; and

(4) Nabors' motion for a summary judgment [Doc. No. 39] is hereby **DENIED**.

Plaintiff and Nabors shall proceed to trial as scheduled on all remaining claims.

SO ORDERED.

ENTER:

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE